## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| BEACH GLO TANNING STUDIO INC., on behalf of itself and all others similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>SCOTTSDALE INSURANCE COMPANY and NATIONWIDE MUTUAL INSURANCE COMPANY,<br><br>    Defendants. | Case No.<br><br><br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Beach Glo Tanning Studio Inc. ("Plaintiff" or "Studio"), by and through its undersigned counsel and on behalf of itself and all others similarly situated, files this Class Action Complaint (the "Complaint") against Defendants, Scottsdale Insurance Company ("Scottsdale") and Nationwide Mutual Insurance Company ("Nationwide"), and alleges as follows:

### NATURE OF THE CLASS ACTION

1.      This proposed class action is about two insurance companies, Scottsdale and its parent company, Nationwide (collectively, "Defendants"), that used a time of international crisis to blatantly cheat the Plaintiff out of money owed to it by issuing blanket denials to valid insurance claims.  Because Defendants have not, and will not, comply with the terms of the insurance policies issued to the Plaintiff and other similarly situated businesses located in the State of New Jersey and elsewhere, Plaintiff brings this case as a Rule 23 class action.

2.      Plaintiff is a tanning studio located in Point Pleasant, Ocean County, New Jersey, that serves the community and consumers by offering a variety of tanning products and services.

3.      On March 11, 2020, World Health Organization ("WHO") Director General Tedros Adhanom Ghebreyesus declared the COVID-19 outbreak a worldwide pandemic: "WHO has been assessing this outbreak around the clock and we are deeply concerned both by the alarming levels of spread and severity, and by the alarming levels of inaction.  We have therefore made the assessment that COVID-19 can be characterized as a pandemic."[1]

4.      On March 13, 2020, U.S. President Trump declared the COVID-19 pandemic to be a national emergency.[2]  On March 16, 2020, the Centers for Disease Control and Prevention ("CDC"), and members of the national Coronavirus Task Force issued to the American public guidance, styled as "30 Days to Slow the Spread," for stopping the spread of COVID-19.  This guidance advised individuals to adopt far-reaching social distancing measures, such as working from home, avoiding shopping trips and gatherings of more than ten people, and staying away from bars, restaurants, food courts, and similar public places.[3]

5.      Following this advice for individuals to adopt far-reaching social distancing measures, many state government administrations across the nation recognized the need to take steps to protect the health and safety of their residents from the human to human and surface to human spread of COVID-19.  As a result, many governmental entities entered or issued civil authority orders suspending or severely curtailing business operations of non-essential businesses that interact with the public and provide gathering places for the individuals.  Currently, almost

---

[1]      *See* World Health Organization, *WHO Director-General's opening remarks at the media briefing on COVID-19 - 11 March 2020* (Mar. 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-mediabriefing- on-covid-19---11-march-2020.

[2]      *See* The White House, *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak* (Mar. 13. 2020), https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergencyconcerning-novel-coronavirus-disease-covid-19-outbreak/.

[3]      *See The President's Coronavirus Guidelines for America, 30 Days to Slow the Spread*, WHITE HOUSE, https://www.whitehouse.gov/wp-content/uploads/2020/03/03.16.20_coronavirusguidance_8.5x11_315PM.pdf (last visited Apr. 27, 2020).

all of the states within the United States have issued some sort of "stay-at-home" order and ordered private non-essential business operations to close.

6.    The result of these far-reaching restrictions and prohibitions has been catastrophic for most "non-essential" businesses, especially restaurants and other food service businesses, as well as retail establishments, entertainment venues, and other small, medium, and large businesses who have been forced to close, furlough employees, and endure a sudden shutdown of cash flow that threatens their survival.

7.    Most businesses insure against such catastrophic events like the current unforeseen COVID-19 pandemic by purchasing all-risk commercial property insurance policies. These policies promise to indemnify the policyholder for actual business losses incurred when business operations are involuntarily suspended, interrupted, or curtailed, and when access to the premises is prohibited because of direct physical loss or damage to the property, or by a civil authority order that restricts or prohibits access to the property.  This type of insurance coverage is commonly known as "business interruption coverage" and is standard in most all-risk commercial property insurance policies.

8.    Defendants, and most insurance companies that have issued all-risk commercial property insurance policies with business interruption coverage, continue to deny their obligation to pay for business income losses and other covered expenses incurred by policyholders for the physical loss and damage to the insured property from measures put in place by the civil authorities to stop the spread of COVID-19 among the population.  This class action brought by Plaintiff seeks, among other forms of relief, a declaratory judgment that affirms that the COVID-19 pandemic and the corresponding response by civil authorities to stop the spread of the outbreak triggers coverage, has caused physical property loss and damage to the insured

property, provides coverage for future civil authority orders that result in future suspensions or curtailments of business operations, and finds that Defendants are liable for the losses suffered by policyholders, including Plaintiff and the members of the Class.

9.     In addition, this proposed class action asserts a claim against Defendants for breach(es) of their contractual obligation under common all-risk commercial property insurance policies to indemnify Plaintiff and others similarly situated for business losses and extra expenses, and related losses resulting from actions taken by civil authorities to stop the human-to-human and surface-to-human spread of the COVID-19 outbreak.

10.    Under Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of a proposed class of policyholders who paid premiums in exchange for business insurance policies that included lost business income and extra expense coverage.

## PARTIES

11.    Plaintiff is a New Jersey company with its principal place of business located in Ocean County, New Jersey.  Plaintiff operates a tanning studio in Point Pleasant, Ocean County, New Jersey.

12.    Defendant Scottsdale is an Arizona corporation with its principal place of business located in Scottsdale, Maricopa County, Arizona, and it does business in this District. Defendant Scottsdale is a subsidiary of Defendant Nationwide.

13.    Defendant Nationwide is an Arizona corporation with its principal place of business located in Columbus, Franklin County, Ohio, and it does business in this District.

## JURISDICTION AND VENUE

14.    This Court has original jurisdiction over this case pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because (a) at least one member of the proposed Class and

subclasses is a citizen of a state different from that of the Defendants, (b) the amount in controversy exceeds $5,000,000, exclusive of interest and costs, (c) the proposed Class and subclasses each consist of more than 100 members, and (d) none of the exceptions under 28 U.S.C. § 1332(d) apply to this action.

15.     This Court has personal jurisdiction over Defendants because they are registered to do business in New Jersey, have sufficient minimum contacts in New Jersey, and otherwise intentionally avail themselves of the markets within New Jersey through their business activities, such that the exercise of jurisdiction by this Court is proper.  Moreover, the claims of Plaintiff and all of the members of the Class and subclasses in this case arise out of and directly relate to Defendants' contacts with New Jersey.

16.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District. Defendants have marketed, advertised, sold, and maintained insurance policies, and otherwise conducted extensive business activities, within this District.

## **FACTUAL ALLEGATIONS**

### I.    **The Rapid Spread of Corona Virus**

17.     COVID-19 is an infectious disease caused by a novel coronavirus known as SARS-CoV-2 ("Coronavirus" or "COVID-19").   The first known instances of the disease spreading to humans were diagnosed in or around December 2019.

18.     In December 2019, an initial cluster of patients with an unknown cause of viral pneumonia was found to be linked to the Huanan seafood market located in Wuhan, China, where many non-aquatic animals such as birds were also on sale.  However, at least one of the

patients never visited the market, although he had stayed in a hotel nearby before the onset of the illness.[4]

19.     By January 2020, genetic sequencing from patient samples was conducted to identify a novel virus, SARS-CoV-2, as the causative agent for the pneumonia cluster.[5] SARSCoV-2 is an RNA virus, with a crown-like appearance under an electron microscope because of glycoprotein spikes on its envelope.  Among the functions of the structural proteins, the envelope has a crucial role in virus pathogenicity as it promotes viral assembly and release.[6]

20.     The first confirmed case of the virus outside China was diagnosed on January 13, 2020, in Bangkok, Thailand, with the number of cases exceedingly increasing worldwide.  On January 30, 2020, the WHO declared the SARS-CoV-2 outbreak constituted a public health emergency of international concern, and by February 11, 2020, the disease caused by SARSCoV-2 was named "COVID-19" by the WHO Director-General.[7]  As of April 23, 2020, the WHO reported a confirmed 2.5 million cases of COVID-19 globally and over 170,000 deaths, with the United States dealing with more than 800,000 confirmed cases and 40,000 deaths – more than any other country.[8]

---

[4]     *See id.*; Francesco Di Gennaro et al., *Coronavirus Diseases (COVID-19) Current Status and Future Perspectives a Narrative Review*, MDPI: INT'L J. ENVTL. RESEARCH & PUB. HEALTH (Apr. 1, 2020), https://www.mdpi.com/1660-4601/17/8/2690 (There are four genera of coronaviruses: (I) α-coronavirus (alphaCoV) and (II) β-coronavirus (betaCoV), which are probably present in bats and rodents; and (III) δ-coronavirus (deltaCoV) and (IV) γ-coronavirus (gammaCoV), which probably represent avian species.).

[5]     *See* Di Gennaro, *supra* note 4.

[6]     *See id.* (To address the pathogenetic mechanisms of SARS-CoV-2, its viral structure and genome must be considered. Coronaviruses are enveloped positive strand RNA viruses with the largest known RNA genomes – 30-32 kb – with a 5'-cap structure and 3'-poly-A tail.).

[7]     *See id.*

[8]     *See Coronavirus disease 2019 (COVID-19) Situation Report* – 94, WORLD HEALTH ORGANIZATION (Apr. 23, 2020) https://www.who.int/docs/default-source/coronaviruse/situationreports/20200423-sitrep-94-covid-19.pdf?sfvrsn=b8304bf0_4.

21.    The clinical features of COVID-19 vary from asymptomatic forms to fatal conditions of severe respiratory failure that requires ventilation and support in an intensive care unit ("ICU").  Pneumonia has been the most frequent severe manifestation of COVID-19, with symptoms of fever, cough, dyspnea, and bilateral infiltrates on chest imaging.[9]  There are no specific treatments recommended for COVID-19, and no vaccine is currently available; so understanding the complexities of COVID-19 is ongoing.[10]

22.    It has now been discovered by scientists that COVID-19 has several modes of transmission.  Pursuant to a "Situation Report" released by the WHO, the virus can be transmitted through symptomatic transmission, pre-symptomatic transmission, or asymptomatic transmission.[11]  Symptomatic transmission refers to transmission by an individual who is experiencing symptoms associated with the virus who then transfers COVID-19 to another individual.  Data from published studies provide evidence that COVID-19 is primarily transmitted from symptomatic people to others who are in close contact through respiratory droplets, by direct contact with infected persons, or by contact with contaminated objects and surfaces.[12]

---

[9]    *See* Di Gennaro, *supra* note 4 (Asymptomatic infections have also been described, but their frequency is unknown. Other, less common symptoms have included headaches, sore throat, and rhinorrhea. Along with respiratory symptoms, gastrointestinal symptoms (*e.g.*, nausea and diarrhea) have also been reported, and in some patients, they may be the presenting complaint.).

[10]    *See id.* (The treatment is symptomatic, and oxygen therapy represents the major treatment intervention for patients with severe infection. Mechanical ventilation may be necessary in cases of respiratory failure refractory to oxygen therapy, whereas hemodynamic support is essential for managing septic shock. Different strategies can be used depending on the severity of the patient and local epidemiology. Home management is appropriate for asymptomatic or paucisymtomatic patients. They need a daily assessment of body temperature, blood pressure, oxygen saturation and respiratory symptoms for about 14 days. Management of such patients should focus on prevention of transmission to others and monitoring for clinical status with prompt hospitalization if needed.).

[11]    *See World Health Organization, Coronavirus disease 2019 (COVID-19) Situation Report – 73* (Apr. 3, 2020), https://www.who.int/docs/default-source/coronaviruse/situationreports/20200402-sitrep-73-covid-19.pdf?sfvrsn=5ae25bc7_2.

[12]    *See id.* (Data from clinical and virologic studies that have collected repeated biological samples from confirmed patients provide evidence that shedding of the COVID-19 virus is highest in the upper respiratory tract

23.    The incubation period for COVID-19, which is the time between exposure to the virus (becoming infected) and symptom onset, averages five to six days, however, it can be up to 14 days.[13]    During this period, also known as the "pre-symptomatic" period, some infected persons can be contagious.  For that reason, transmission from a pre-symptomatic case can occur before symptom onset.    Pre-symptomatic transmission still requires the virus to be spread through infectious droplets or touching contaminated surfaces.[14]

24.    An individual who does not develop symptoms, an asymptomatic case of COVID-19, can still transmit the virus to another.  Although there are few documented cases reported, it does not exclude the possibility that it has or may occur.[15]

25.    Not only is COVID-19 transmitted via human-to-human, but the WHO and scientific studies have confirmed that the virus can live on contaminated objects or surfaces. According to a study by scientists documented in *The New England Journal of Medicine*, COVID-19 was detectable in aerosols for up to three hours, up to four hours on copper, up to 24 hours on cardboard, and up to two to three days on plastic and stainless steel.[16]  Most of these

---

(nose and throat) early in the course of the disease. That is, within the first three days from onset of symptoms. Preliminary data suggests that people may be more contagious around the time of symptom onset as compared to later on in the disease.).

[13]    *See id.*

[14]    *See id.* (In a small number of case reports and studies, pre-symptomatic transmission has been documented through contact tracing efforts and enhanced investigation of clusters of confirmed cases. This is supported by data suggesting that some people can test positive for COVID-19 from 1-3 days before they develop symptoms. Thus, it is possible that people infected with COVID-19 can transmit the virus before significant symptoms develop.).

[15]    *See id.*

[16]    *See* News Release, *New coronavirus stable for hours on surfaces*, NAT'L INSTS. OF HEALTH (Mar. 17, 2020), https://www.nih.gov/news-events/news-releases/new-coronavirus- stable-hours-surfaces; see also World Health Organization, *Modes of transmission of virus causing COVID-19: implications for IPC* (Mar. 29, 2020), https://www.who.int/news- room/commentaries/detail/modes-of-transmission-of-virus-causing-covid-19-implications-for- ipc-precaution-recommendations (Airborne transmission of COVID-19 "may be possible in specific circumstances and settings in which procedures or support treatments that generate aerosols are performed; i.e., endotracheal intubation, bronchoscopy, open suctioning, administration of nebulized treatment, manual ventilation before intubation, turning the patient to the prone position, disconnecting the patient from the ventilator,

materials are used in tanning studios and personal care businesses. The results of the study suggest that individuals could get COVID-19 through indirect contact with surfaces or objects used by an infected person, whether or not they were symptomatic.

26.    Another scientific study documented in the *Journal of Hospital Infection* found that human coronaviruses, such as SARS-CoV and MERS-CoV, can remain infectious on inanimate surfaces at room temperature for up to nine days.[17] At a temperature of 30 degrees Celsius or more, the duration of persistence is shorter. Contamination of frequently touched surfaces is, therefore, a potential source of viral transmission.[18] Although this study was not conclusive on COVID-19 itself, scientists are still grappling to understand this implication.

27.    On March 27, 2020, the CDC released a report entitled "*Public Health Responses to COVID-19 Outbreaks on Cruise Ships - Worldwide, February - March 2020.*"[19] The report detailed that during this time frame, COVID-19 outbreaks associated with three different cruise ship voyages caused over 800 confirmed cases and ten deaths.[20] Of the individuals tested, a high

---

non-invasive positive-pressure ventilation, tracheostomy, and cardiopulmonary resuscitation.").

[17]    *See* G. Kampf et al., *Persistence of coronaviruses on inanimate surfaces and their inactivation with biocidal agents*, J. HOSPITAL INFECTION (Jan. 31, 2020), https://www
.journalofhospitalinfection.com/action/showPdf?pii=S0195-6701%2820% 2930046-3.

[18]    *See id.* (Although the viral load of coronaviruses on inanimate surfaces is not known during an outbreak situation, it seems plausible to reduce the viral load on surfaces by disinfection, especially of frequently touched surfaces in the immediate area surrounding a patient where the highest viral load can be expected. The WHO recommends ensuring that "environmental cleaning and disinfection procedures are followed consistently and correctly.").

[19]    *See* Leah F. Moriarty, MPH, *Public Health Responses to COVID-19 Outbreaks on Cruise Ships - Worldwide, February - March 2020*, CTRS. FOR DISEASE CONTROL & PREVENTION (Mar. 27, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e3.htm?s_cid= mm6912e3_w.

[20]    *See id.* ("During February 7-23, 2020, the largest cluster of COVID-19 cases outside mainland China occurred on the Diamond Princess cruise ship, which was quarantined in the port of Yokohama, Japan, on February 3…. On March 6, cases of COVID-19 were identified in persons on the Grand Princess cruise ship off the coast of California; that ship was subsequently quarantined. By March 17, confirmed cases of COVID-19 had been associated with at least 25 additional cruise ship voyages. On February 21, CDC recommended avoiding travel on cruise ships in Southeast Asia; on March 8, this recommendation was broadened to include deferring all cruise ship travel worldwide for those with underlying health conditions and for persons [over] 65 years. On March 13, the Cruise Lines International Association announced a 30-day voluntary suspension of cruise operations in the United

proportion were found to be asymptomatic, which may explain the high rates on cruise ships. What is interesting about this study though, is that COVID-19 was identified on a variety of surfaces in cabins of both symptomatic and asymptomatic infected passengers up to 17 days after cabins were vacated on the Diamond Princess cruise line, but before disinfection procedures had been conducted.[21] The CDC notes that more studies are required to understand the perpetuation of transmission, but what is clear is the uncertainty around COVID-19 and its implications for the lawful and safe functioning of a variety of businesses, including tanning studios and personal care businesses.

28.    Without a vaccine to protect against COVID-19, effective control of the outbreak relies on measures designed to reduce human-to-human and surface-to-human exposure. Recent information on the CDC's website provides that COVID-19 spreads when people are within six feet of each other or when a person comes in contact with a surface or object that has the virus on it.[22] Various other sources state that close contact with a person with the virus or surfaces where the virus is found can transmit the virus.[23]

---

States. CDC issued a level 3 travel warning on March 17, recommending that all cruise travel be deferred worldwide.").

[21]    See id. ("Cruise ships are often settings for outbreaks of infectious diseases because of their closed environment, contact between travelers from many countries, and crew transfers between ships. On the Diamond Princess, transmission largely occurred among passengers before quarantine was implemented, whereas crew infections peaked after quarantine…. On the Grand Princess, crew members were likely infected on voyage A and then transmitted [COVID-19] to passengers on voyage B. The results of testing of passengers and crew on board the Diamond Princess demonstrated a high proportion (46.5%) of asymptomatic infections at the time of testing. Available statistical models of the Diamond Princess outbreak suggest that 17.9% of infected persons never developed symptoms…. A high proportion of asymptomatic infections could partially explain the high attack rate among cruise ship passengers and crew…. Although these data cannot be used to determine whether transmission occurred from contaminated surfaces, further study of fomite transmission of [COVID-19] aboard cruise ships is warranted.").

[22]    See Centers for Disease Control and Prevention, How COVID-19 Spreads, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-COVID- spreads.html (last visited Apr. 27, 2020).

[23]    See Kampf, supra note 17 (remains infectious from two hours to 28 days depending on conditions); see also Nina Bai, Why One Test May Not Be Enough, UCSF (Feb. 13, 2020),

29.     The secondary exposure of the surface-to-humans is particularly acute in places where the public gathers typically to socialize, eat, drink, shop, be entertained, and go for personal care, such as tanning studios or gymnasiums.  This is why the CDC recommends that in viral outbreaks individuals who are infected stay at home and those who are not sick engage in preventive measures such as constant hand washing and avoiding activities that would bring them into close proximity of people with the virus or surfaces where the virus may reside.  However, because these recommendations have proven ineffective to minimize the spread of COVID-19, containment efforts have led to civil authorities issuing orders closing many business establishments, including restaurants, bars, hotels, theaters, personal care salons, tanning studios, gymnasiums, and schools, and mandating social distancing among the population.  This has caused the cancelation of sporting events, parades, and concerts, the closure of amusement parks, and substantial travel restrictions.

## II.     Closure Orders Shutdown Businesses Across the Country

30.     On March 16, 2020, the Centers for Disease Control and Prevention, and members of the national Coronavirus Task Force issued to the American public guidance, styled as "30 Days to Slow the Spread" concerning measures to slow the spread of COVID-19.  This guidance advocated for far-reaching social distancing measures, such as working from home, avoiding shopping trips and gatherings of more than ten (10) people, and staying away from bars, restaurants, and food courts.

31.     Following this advice and recognizing that there had been numerous confirmed cases of COVID-19 in their jurisdictions, many state government administrations across the

---

https://www.ucsf.edu/news/2020/02/416671/how-new-coronavirus-spreads-and-progresses-andwhy-one-test-may-not-be-enough (door knobs and table tops can contain the virus); Heather Murphy, *Surfaces? Sneezes? Sex? How the Coronavirus Can and Cannot Spread*, N.Y. TIMES (Mar. 19, 2020),
https://www.nytimes.com/2020/03/02/health/coronavirus-how-it-spreads.html (virus can remain on metal and plastic for several days).

nation recognized the need to take steps to protect their residents from the spread of COVID-19. As a result, many governmental administrations entered civil authority orders suspending or severely curtailing business operations of non-essential businesses that interact with the public and provide gathering places for the individuals.

32.     To help create a framework for the implementation of such policies in New Jersey, on March 9, 2020, New Jersey Governor Philip Murphy issued a Proclamation of Public Health Emergency and State of Emergency, the first formal recognition of an emergency situation in the State of New Jersey as a result of COVID-19. *See* Executive Order No. 103, attached hereto as **Exhibit 1**.

33.     On March 16, 2020, Governor Murphy issued an Order requiring all non-essential businesses in the State of New Jersey to cease operations and close all physical locations. Businesses that were permitted to remain open were "may remain open if they limit their occupancy to no more than 50 persons and adhere to social distancing guidelines." *See* Executive Order No.104, attached hereto as **Exhibit 2**.

34.     On March 21, 2020, Governor Murphy issued a Stay-at-Home Order for residents of New Jersey. *See* Executive Order No. 107, attached hereto as **Exhibit 3**. This Order specified that "brick-and-mortar premises of all non-essential retail businesses must close to the public as long as this Order remains in effect."[24] Pursuant to the Closure Orders, the Plaintiff was forced

---

[24]     This Order enumerated essential businesses as follows:  Grocery stores, farmer's markets and farms that sell directly to customers, and other food stores, including retailers that offer a varied assortment of foods comparable to what exists at a grocery store; Pharmacies and alternative treatment centers that dispense medicinal marijuana; Medical supply stores; Retail functions of gas stations; Convenience stores; Ancillary stores within healthcare facilities; Hardware and home improvement stores; Retail functions of banks and other financial institutions; Retail functions of laundromats and dry-cleaning services; Stores that principally sell supplies for children under five years old; Pet stores; Liquor stores; Car dealerships, but only to provide auto maintenance and repair services, and auto mechanics; Retail functions of printing and office supply shops; and Retail functions of mail and delivery stores. *See* **Exhibit 3**.

to close its business. (The above-referenced Orders are collectively referred to as the "Closure Orders.").

35.     As a direct consequence of the Closure Orders, which were issued to protect the public safety, since March 15, 2020, Plaintiff and the members of the Class have suffered a significant loss of business income and incurred extra expenses. Among other things, the Closure Orders caused a diminishment of functional space and loss of functionality of covered property.

**III.    Defendants' Standard All-Risk Commercial Property Insurance Policies.**

36.     In many countries, property insurance is sold on a "specific peril" basis.  Such policies only cover losses from causes that are expressly covered like an earthquake, fire, or terrorist attack.   Conversely, most property policies sold in the United States are "all-risk" property damage policies which cover losses from *all* causes that are not expressly excluded.

37.     Defendants' insurance policies issued to Plaintiff and the members of the Class are "all-risk" commercial property polices that cover loss or damage to the covered premises resulting from all risks, except those expressly excluded.

38.     Plaintiff's insurance policy, as well as the insurance policies of other Class members, are standard forms that are used by Defendants for all of their insureds having applicable coverage and provide identical or substantially similar coverage for all Class members.

**IV.    Plaintiff's Factual Allegations**

39.     To protect itself and the income generated by its business operations, Plaintiff purchased a policy of insurance issued by Defendants with policy number CPS3192537 (the "Policy"). (Attached hereto as **Exhibit 4**.)

40.    Plaintiff was told by the agent of Defendant that the Policy was "full coverage" insurance.  Plaintiff was also informed by the agent that the Policy would provide coverage for any kind of loss of income.

41.    Among the coverages provided by the Policy was business interruption insurance which, generally speaking, would indemnify Plaintiff for lost income and profits in the event that its business was shut down.

42.    The Business Income (and Extra Expense) Coverage Form, CP 00 30 10 12, in Plaintiff's Policy states:

> We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct physical loss of or damage to property at premises which are described in the Declarations and for which a Business Income Limit Of Insurance is shown in the Declarations. The loss or damage must be caused by or result from a Covered Cause of Loss. With respect to loss of or damage to personal property in the open or personal property in a vehicle, the described premises include the area within 100 feet of such premises.

43.    The Policy defines "Business Income" as follows:

**A. Coverage**
  **1. Business Income**
    Business Income means the:
    **a.** Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and
    **b.** Continuing normal operating expenses incurred, including payroll.

44.    The Policy also provides coverage for "Extra Expenses" incurred by the Plaintiff

2. **Extra Expense**

    a. Extra Expense Coverage is provided at the premises described in the Declarations only if the Declarations show that Business Income Coverage applies at that premises.

    b. Extra Expense means necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss.

    We will pay Extra Expense (other than the expense to repair or replace property) to:

    (1) Avoid or minimize the "suspension" of business and to continue operations at the described premises or at replacement premises or temporary locations, including relocation expenses and costs to equip and operate the replacement location or temporary location.

    (2) Minimize the "suspension" of business if you cannot continue "operations".

    We will also pay Extra Expense to repair or replace property, but only to the extent it reduces the amount of loss that otherwise would have been payable under this Coverage Form.

45.     The Business Income (and Extra Expense) Coverage Form further provides "Civil Authority" coverage:

**5.  Additional Coverages**

**a.  Civil Authority**

In this Additional Coverage, Civil Authority, the described premises are premises to which this Coverage Form applies, as shown in the Declarations.

When a Covered Cause of Loss causes damage to property other than property at the described premises, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises, provided that both of the following apply:

**(1)** Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within that area but are not more than one mile from the damaged property; and

**(2)** The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

Civil Authority Coverage for Business Income will begin 72 hours after the time of the first action of civil authority that prohibits access to the described premises and will apply for a period of up to four consecutive weeks from the date on which such coverage began.

Civil Authority Coverage for Extra Expense will begin immediately after the time of the first action of civil authority that prohibits access to the described premises and will end:

**(1)** Four consecutive weeks after the date of that action; or

**(2)** When your Civil Authority Coverage for Business Income ends;

whichever is later.

46.     Plaintiff and the members of the Class have suffered a direct physical loss of and damage to their property because they have been unable to use their property for its intended purpose.

47.     The Policy also contains an exclusion for damage caused by contamination by any virus, which states:

> **B.** We will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease.

48.     The so-called "virus exclusion" is not applicable to this case because Plaintiff's and Class members' losses were not caused by a "virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease." Rather, the sole proximate cause of Plaintiff's and Class Members' losses was the Closure Orders, not because coronavirus was found in or on Plaintiff's insured property or that the virus itself caused damage to Plaintiff's and Class Members' insured property.

49.     Moreover, the so-called "virus exclusion" is ambiguous. It is not clear that the plain language of the policy unambiguously and necessarily excludes Plaintiff's losses that were caused by the Closure Orders.

50.     Notwithstanding the foregoing facts and circumstances, by way of letter dated July 7, 2020, Defendants denied Plaintiff's claims for business interruption coverage, claiming, *inter alia*, that Plaintiff had not suffered a physical loss or damage as a result of being shut down by the Closure Orders and that Plaintiff's loss was caused by a virus.

**V.     The Closure Orders Have Affected Policyholders Across The Country**

51.     The Closure Orders are physically impacting private commercial property throughout the United States and the State of New Jersey, threatening the survival of thousands

of restaurants, retail establishments, and other businesses that have had their business operations suspended or curtailed indefinitely by order of civil authorities.

52.     Defendants have refused to cover losses caused by the Closure Orders as part of business interruption coverage.  As previously stated, Defendants denied Plaintiff's claim, even though Plaintiff was forced to close its doors due to the Closure Orders.  Upon information and belief, Defendants have denied similar claims submitted by other members located throughout the country, a practice which is belied by not only the express terms of the insurance policies, but also (a) the U.S. Small Business Administration's requirement that "reimbursement" from "business interruption insurance" be submitted along with an application for an Economic Injury Disaster Loan ("EIDL") loan;[25] and (b) America's SBDC, whose COVID-19 newsletter expressly states: "Business interruption insurance also applies if government actions cause operations to cease temporarily, which results in a loss for a firm."[26]

53.     As a result, many small businesses that maintain commercial multi-peril insurance policies with business interruption coverage will have significant uninsured losses absent declaratory relief from this Court.  Indeed, even if state and local governments eventually re-open, small businesses certainly still governed by social-distancing mandates and will continue to experience diminishing revenues due to the loss of covered property.

54.     A declaratory judgment determining that the Loss of Income coverage provided in standard commercial property insurance policies applies to the suspension, curtailment, and interruption of business operations resulting from measures put into place by civil authorities is

---

[25]     *Applying for SBA Disaster Loans (EIDL)* at 12, U.S. SMALL BUS. ADMIN. (Mar. 26, 2020), https://www.sba.gov/sites/default/files/articles/EIDL_

[26]     *COVID-19: The Latest News and Resources for Your Business*, at 15, AMERICA'S SBDC (Mar. 20, 2020), https://www.dropbox.com/s/jcw2iw9vk2hcq9y/COVID%2019%20-%20Rev6.pdf?dl=0 (last visited Apr. 30, 2020).

necessary to prevent Plaintiff and the members of the Class from being denied critical coverage for which they have paid millions of dollars in premiums.

## CLASS ACTION ALLEGATIONS

55.     Plaintiff brings this lawsuit pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of itself and all other persons similarly situated.

The **Multi-State Class** is defined as:

All entities who have entered into standard all-risk commercial property insurance policies with Scottsdale Insurance Company or Nationwide Mutual Insurance Company insuring property in the United States, where such policies provide for business income loss and extra expense coverage and do not exclude coverage for pandemics, and who have suffered losses due to measures put in place by civil authorities' stay-at-home or shelter-in-place orders since March 15, 2020.

The **New Jersey Sub-Class** is defined as:

All entities who have entered into standard all-risk commercial property insurance policies with Scottsdale Insurance Company and Nationwide Mutual Insurance Company insuring property in New Jersey, where such policies provide for business income loss and extra expense coverage and do not exclude coverage for pandemics, and who have suffered losses due to measures put in place by civil authorities' stay-at-home or shelter-in-place orders since March 15, 2020.

Excluded from Multi-State Class and from the New Jersey Sub-Class are the Defendants, their employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliated companies; class counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case.

56.     Plaintiff reserves the right to modify, expand, or amend the definitions of the proposed class(es) following the discovery period and before the Court determines whether class certification is appropriate.

57.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of its claim and Class members' claims on a class-wide basis

using the same evidence as would prove those elements in individual actions alleging the same claims.

## I.    Numerosity

58.    This action satisfies the requirements of Rule 23(a)(1). The Multi-State Class and/or the New Jersey Sub-Class numbers at least in the hundreds and consists of geographically dispersed business entities who are insured for business interruption losses. Defendants sells insurance policies throughout the United States and, therefore, joinder of the Class members is impracticable.

59.    The identity of Class members is ascertainable because the names and addresses of all Class members can be identified in Defendants' or their agents' books and records. Plaintiff anticipates providing appropriate notice to the Class in compliance with Rule 23(c)(2)(A) and/or (B), to be approved by the Court after class certification, or pursuant to court order under Fed. R. Civ. P. 23(d).

## II.    Typicality

60.    This action satisfies the requirements of Rule 23(a)(3) because Plaintiff's claims are typical of the claims of each of the Class members because all Class members were and are similarly affected and their claims arise from the same all-risk commercial property insurance policy provisions entered into with Defendants.  Each Class member's insurance policy contains the same form providing coverage for business income loss. None of the forms exclude coverage due to a governmental action intended to reduce the effect of the ongoing global pandemic. As a result, a declaratory judgment as to the rights and obligations under Plaintiff's Policy will address the rights and obligations of all policyholders.

## III.    Adequacy of Representation

61.    Plaintiff is committed to prosecuting the action, will fairly and adequately protect the interests of the members of the class, and has retained counsel competent and experienced in class action litigation, including litigation relating to insurance policies.  Plaintiff is aware of no interests antagonistic to or in conflict with other members of the Class.  Plaintiff anticipates no difficulty in the management of this litigation as a class action.

## IV.    Commonality

62.    This action satisfies the requirements of Rule 23(a)(2) because there are questions of law and fact that are common to each of the Class and Sub-Class.  These common questions predominate over any questions affecting only individual Class members.  The questions of law and fact common to the Class include, but are not limited to:

    a.    Whether there is an actual controversy between Plaintiff and Defendants as to the rights, duties, responsibilities and obligations of the parties under the business interruption provisions in standard all-risk commercial property insurance policies;

    b.    Whether measures in response to the COVID-19 pandemic are excluded from Plaintiff's and the Class members' standard all-risk commercial property insurance policies;

    c.    Whether the measures put in place by civil authorities' Closure Orders, stay-at-home, or shelter-in-place orders since March 15, 2020, resulted in a covered loss to covered commercial property;

    d.    Whether Defendants have repudiated and anticipatorily breached the all-risk commercial property insurance policies they issued with business interruption coverage by intending to deny claims for coverage; and

e.  Whether Plaintiff and the Class members suffered damages as a result of the anticipatory breach by Defendants.

## V.    Superiority/Predominance

63.    This action satisfies the requirements of Rule 23(b)(3).  A class action is superior to other available methods for the fair and efficient adjudication of the rights of the class members.  The joinder of individual class members is impracticable because of the vast number of Class members who have entered into the standard all-risk commercial property insurance policies with Defendants.

64.    Because a declaratory judgment as to the rights and obligations under the uniform all-risk commercial property insurance policies will apply to all Class members, most or all Class members would have no rational economic interest in individually controlling the prosecution of specific actions. The burden imposed on the judicial system by individual litigation, and to Defendants, by even a small fraction of the Class members, would be substantial.

65.    In comparison to piecemeal litigation, class action litigation presents far fewer management difficulties, far better conserves the resources of both the judiciary and the parties, and far more effectively protects the rights of each Class member.  The benefits to the legitimate interests of the parties, the Court, and the public resulting from class action litigation substantially outweigh the expenses, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation.  Class adjudication is superior to other alternatives under Rule 23(b)(3)(D).  Class action treatment will also avoid the substantial risk of inconsistent factual and legal determinations on the many issues in this lawsuit.

66.    Plaintiff knows of no obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action.  Rule 23 provides the Court with the

authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges. The Court may, on motion of Plaintiff or on its own determination, certify nationwide and statewide classes for claims sharing common legal questions; use the provisions of Rule 23(c)(4) to certify particular claims, issues, or common questions of law or of fact for class-wide adjudication; certify and adjudicate bellwether class claims; and use Rule 23(c)(5) to divide any Class into subclasses.

## COUNT ONE

### DECLARATORY RELIEF – BUSINESS INCOME COVERAGE
### (On Behalf of the Multi-State Class and New Jersey Sub-Class)

67.    Plaintiff re-alleges and incorporates by reference into this cause of action all allegations set forth in the preceding paragraphs of this Complaint. To the extent necessary, this cause of action is pleaded in the alternative to the other causes of action.

68.    Plaintiff brings this claim for declaratory relief individually and on behalf of the other members of the Multi-State Class and New Jersey Sub-Class.

69.    Plaintiff's Policy, as well as those of the other Class members, are contracts under which Defendants were paid premiums in exchange for its promise to pay Plaintiff's and the Class members' losses for claims covered by the Policies.

70.    On information and belief, Plaintiff and other Class members have complied with all applicable provisions of the Policies and/or those provisions have been waived by Defendants or Defendants are estopped from asserting them, and yet Defendants have abrogated their insurance coverage obligations pursuant to the Policies' clear and unambiguous terms and have wrongfully and illegally refused to provide coverage to which Plaintiff and Class members are entitled.

71.     On information and belief, Defendants have denied claims related to Closure Orders on a uniform and class-wide basis, without individual bases or investigations, so this Court can render declaratory judgment no matter whether members of the Class have filed a claim.

72.     An actual case or controversy exists regarding Plaintiff's and Class members' rights and Defendants' obligations under the Policies to reimburse Plaintiff and Class members for the full amount of Business Income losses incurred by Plaintiff and the other Class members in connection with the suspension of their businesses stemming from Closure Orders.

73.     Pursuant to 28 U.S.C. § 2201, Plaintiff and the Class members seek a declaratory judgment from this Court declaring the following:

a.    Plaintiff's and the Class members' Business Income losses incurred in connection with the Closure Orders and the necessary interruption of their businesses stemming from such Orders; and

b.    Defendants are obligated to pay Plaintiff and Class members for the full amount of the Business Income losses incurred and to be incurred in connection with the Closure Orders during the period of restoration and the necessary interruption of their businesses stemming from such Orders.

## COUNT TWO

### BREACH OF CONTRACT – BUSINESS INCOME COVERAGE
### (On Behalf of the Multi-State Class and New Jersey Sub-Class)

74.     Plaintiff re-alleges and incorporates by reference into this cause of action all allegations set forth in the preceding paragraphs of this Complaint.  To the extent necessary, this cause of action is pleaded in the alternative to the other causes of action.

75.     Plaintiff brings this Count individually and on behalf of the other members of the Multi-State Class and New Jersey Sub-Class.

76.     Plaintiff's Policy, as well as those of the Class members, are contracts under which Defendants were paid premiums in exchange for their promise to pay Plaintiff's and the Class members' losses for claims covered by the Policies.

77.     In the Businessowners Coverage Form, Defendants agreed to pay for their insureds' actual loss of Business Income sustained due to the necessary suspension of its operations during the "period of restoration."

78.     In the Businessowners Coverage Form, Defendants agreed to pay for their insureds' actual loss of Business Income sustained due to the necessary "suspension of [their] operations" during the "period of restoration" caused by direct physical loss or damage.

79.     "Business Income" under the Policies means the "(a.) Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and (b.) continuing normal operating expenses incurred, including payroll."

80.     The Closure Orders caused direct physical loss and damage to Plaintiff's and the Class members' Covered Properties, requiring suspension of operations at the Covered Properties.  Losses caused by the Closure Orders thus triggered the Business Income provision of Plaintiff's and the Class members' Policies.

81.     On information and belief, Plaintiff and the Class members have complied with all applicable provisions of their policies and/or those provisions have been waived by Defendants or Defendants are estopped from asserting them, and yet Defendants have abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms.

82.     By denying coverage for any Business Income losses incurred by Plaintiff and the Class members as a result of the Closure Orders, Defendants have breached their coverage obligations under the Policies.

83.     As a result of Defendants breaches of the Policies, Plaintiff and the Class members have sustained substantial damages for which Defendants is liable, in an amount to be established at trial.

## COUNT THREE

### DECLARATORY RELIEF – CIVIL AUTHORITY COVERAGE
### (On Behalf of the Multi-State Class and New Jersey Sub-Class)

84.     Plaintiff re-alleges and incorporates by reference into this cause of action all allegations set forth in the preceding paragraphs of this Complaint.  To the extent necessary, this cause of action is pleaded in the alternative to the other causes of action.

85.     Plaintiff brings this Count individually and on behalf of the other members of the Multi-State Class and New Jersey Sub-Class.

86.     Plaintiff's Policy, as well as those of the Class members, are contracts under which Defendants were paid premiums in exchange for their promise to pay Plaintiff's and Class members' losses for claims covered by the Policies.

87.     On information and belief, Plaintiff and Class members have complied with all applicable provisions of the Policies and/or those provisions have been waived by Defendants or Defendants are estopped from asserting them, and yet Defendants have abrogated their insurance coverage obligations pursuant to the Policies' clear and unambiguous terms and have wrongfully and illegally refused to provide coverage to which Plaintiff and Class members are entitled.

88.     On information and belief, Defendants have denied claims related to Closure Orders on a uniform and class wide basis, without individual bases or investigations, so the

Court can render declaratory judgment no matter whether members of the Class have filed a claim.

89.     An actual case or controversy exists regarding Plaintiff's and Class members' rights and Defendants' obligations under the Policies to reimburse Plaintiff and Class members for the full amount of covered Civil Authority losses incurred by Plaintiff and Class members in connection with Closure Orders and the necessary interruption of their businesses stemming from the Closure Orders.

90.     Pursuant to 28 U.S.C. § 2201, Plaintiff and the Class members seek a declaratory judgment from this Court declaring the following:

    a.  Plaintiff's and Class members' Civil Authority losses incurred in connection with the Closure Orders and the necessary interruption of their businesses stemming from those Orders; and

    b.  Defendants are obligated to pay Plaintiff and Class members the full amount of the Civil Authority losses incurred and to be incurred in connection with the covered losses related to the Closure Orders and the necessary interruption of their businesses stemming from such Orders.

### COUNT FOUR

**BREACH OF CONTRACT – CIVIL AUTHORITY COVERAGE**
**(On Behalf of the Multi-State Class and New Jersey Sub-Class)**

91.     Plaintiff re-alleges and incorporates by reference into this cause of action all allegations set forth in the preceding paragraphs of this Complaint.  To the extent necessary, this cause of action is pleaded in the alternative to the other causes of action.

92.     Plaintiff brings this Count individually and on behalf of the other members of the Multi-State Class and New Jersey Sub-Class.

93.     Plaintiff's Policy, as well as those of the Class members, are contracts under which Defendants were paid premiums in exchange for their promise to pay Plaintiff's and the Class members' losses for claims covered by the Policies.

94.     The Defendants Property Coverage Form provides "Civil Authority" coverage, which promises to pay "the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises," subject to certainly conditions, including the that area surrounding the property is prohibited by a civil authority due to damage and the action by the civil authority is taken in response to a dangerous physical condition resulting from the damage.

95.     The Closure Orders triggered the Civil Authority provision under Plaintiff's and the Class members' Policies.

96.     On information and belief, Plaintiff and the members of the Class have complied with all applicable provisions of the Policies and/or those provisions have been waived by Defendants or Defendants are estopped from asserting them, and yet Defendants have abrogated their insurance coverage obligations pursuant to the Policies' clear and unambiguous terms.

97.     By denying coverage for any business losses incurred by Plaintiff and members of the Class in connection with the Closure Orders, Defendants have breached their coverage obligations under the Policies.

98.     As a result of Defendants' breaches of the Policies, Plaintiff and the members of the Class have sustained substantial damages for which Defendants are liable, in an amount to be established at trial.

## COUNT FIVE

**DECLARATORY RELIEF – EXTRA EXPENSE COVERAGE**
**(On Behalf of the Multi-State Class and New Jersey Sub-Class)**

99.    Plaintiff re-alleges and incorporates by reference into this cause of action all allegations set forth in the preceding paragraphs of this Complaint.  To the extent necessary, this cause of action is pleaded in the alternative to the other causes of action.

100.    Plaintiff brings this Count individually and on behalf of the other members of the Multi-State Class and the New Jersey Sub-Class.

101.    Plaintiff's Policy, as well as those of the Class members, are contracts under which Defendants were paid premiums in exchange for their promise to pay Plaintiff's and Class members' losses for claims covered by the Policies.

102.    On information and belief, Plaintiff and Class members have complied with all applicable provisions of the Policies and/or those provisions have been waived by Defendants or Defendants are estopped from asserting them, and yet Defendants have abrogated their insurance coverage obligations pursuant to the Policies' clear and unambiguous terms and have wrongfully and illegally refused to provide coverage to which Plaintiff and Class members are entitled.

103.    On information and belief, Defendants have denied claims related to Closure Orders on a uniform and class-wide basis, without individual bases or investigations, so the Court can render declaratory judgment no matter whether members of the Class have filed a claim.

104.    An actual case or controversy exists regarding Plaintiff's and Class members' rights and Defendants' obligations under the Policies to reimburse Plaintiff and the Class members for the full amount of Extra Expense losses incurred by Plaintiff and Class members in connection with the Closure Orders and the necessary interruption of their businesses stemming from the Closure Orders.

105.    Pursuant to 28 U.S.C. § 2201, Plaintiff and Class members seek a declaratory judgment from this Court declaring the following:

    a.    Plaintiff's and Class members' Extra Expense losses incurred in connection with the Closure Orders and the necessary interruption of their businesses stemming from such Orders are insured losses under their Policies; and

    b.    Defendants are obligated to pay Plaintiff and Class members for the full amount of the Extra Expense losses incurred and to be incurred in connection with the covered losses related to the Closure Orders during the period of restoration and the necessary interruption of their businesses stemming from such Orders.

## COUNT SIX

### BREACH OF CONTRACT – EXTRA EXPENSE COVERAGE
### (On Behalf of the Multi-State Class and New Jersey Sub-Class)

106.    Plaintiff re-alleges and incorporates by reference into this cause of action all allegations set forth in the preceding paragraphs of this Complaint.  To the extent necessary, this cause of action is pleaded in the alternative to the other causes of action.

107.    Plaintiff brings this Count individually and on behalf of the other members of the Multi-State Class and New Jersey Sub-Class.

108.    Plaintiff's Policy, as well as those of the Class members, are contracts under which Defendants were paid premiums in exchange for their promise to pay Plaintiff's and the Class members' losses for claims covered by the Policies.

109.    In the Businessowners Coverage Form, Defendants also agreed to pay necessary Extra Expense that its insureds incur during the "period of restoration" that the insureds would not have incurred if there had been no direct physical loss or damage to the described premises.

"Extra Expense" means expenses "to avoid or minimize the suspension of business and to continue 'operations,'" and to repair or replace property.

110.    Due to the Closure Orders, Plaintiff and the members of the Class incurred Extra Expense at Covered Property.

111.    On information and belief, Plaintiff and members of the Class have complied with all applicable provisions of the Policies and/or those provisions have been waived by Defendants or Defendants are estopped from asserting them, and yet Defendants have abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms.

112.    By denying coverage for any business losses incurred by Plaintiff and members of the Class in connection with the Closure Orders Defendants have breached their coverage obligations under the Policies.

113.    As a result of Defendants breaches of the Policies, Plaintiff and the members of the Class have sustained substantial damages for which Defendants are liable, in an amount to be established at trial.

## COUNT SEVEN

### VIOLATIONS OF NEW JERSEY CONSUMER FRAUD ACT
### (On Behalf of the Multi-State Class and New Jersey Sub-Class)

114.    Plaintiff re-alleges and incorporates by reference into this cause of action all allegations set forth in the preceding paragraphs of this Complaint.  To the extent necessary, this cause of action is pleaded in the alternative to the other causes of action.

115.    Plaintiff asserts this claim individually and on behalf of the members of the Multi-State Class and New Jersey Sub-Class.

116.    This claim is asserted against Defendants pursuant to the New Jersey Consumer Fraud Act ("NJCFA"), N.J. Stat. Ann. § 56:8-1 *et seq.,* which provides in pertinent part:

The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

N.J. Stat. Ann. § 56:8-2.

117.    At all relevant times, the Plaintiff, the members of the Class, and the Defendants are "persons" within the meaning of Section 56:8-1(c) of the NJCFA.

118.    Defendants sell "merchandise," as defined by the NJCFA, by offering insurance products to the public, including Plaintiff and other businesses.

119.    Defendants engaged in unconscionable and deceptive acts and practices, misrepresentation and the concealment, suppression, and omission of material facts with respect to the sale and advertisement of their services in violation of N.J. Stat. Ann. § 56:8-2.  Such conduct includes, but is not limited, to the following:

a.  denying claims related to Closure Orders on a uniform and class-wide basis, without individual bases or investigations;

b.  abrogating its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms and wrongfully and illegally refusing to provide coverage to which Plaintiff and Class members are entitled;

c.  misrepresenting that insurance policies provided "full coverage" and/or provided coverage for any kind of loss of income; and

d.  failing to comply with the terms of its insurance policies for which Plaintiffs have paid millions of dollars in premiums.

120.    The Defendants' practices, as described in this Complaint, constitute acts, uses, or employment by Defendants of unconscionable commercial practices, misrepresentations, or the knowing concealment, suppression or omission of material facts with the intent that others rely upon such concealment, suppression, or omission, in connection with the sale or advertisement of merchandise or with the subsequent performance of such person as aforesaid, in violation of the NJCFA.

121.    As a direct and proximate result of Defendants' unconscionable or deceptive acts and practices, Plaintiff and Class members have suffered an ascertainable loss in money or property, real or personal, as described above, including, but not limited to, significant loss of business income and extra expenses in amounts to be proven at trial.

122.    Plaintiff and Class members and their counsel are, therefore, entitled to injunctive relief, equitable relief, actual damages, treble damages, and attorneys' fees, and costs of litigation pursuant to N.J. Stat. Ann. § 56:8-19.

## COUNT EIGHT

### UNJUST ENRICHMENT
### (On Behalf of the Multi-State Class and New Jersey Sub-Class)

123.    Plaintiff restates and realleges paragraphs 1 through 87 above as if fully set forth herein.

124.    Plaintiff and Class members conferred a monetary benefit on Defendants. Specifically, they purchased Defendants' "all-risk" commercial property policy that covers losses or damage to the covered premises resulting from all risks, except those expressly excluded.

125.    Defendants knew that Plaintiff and Class members conferred a benefit on Defendants and accepted and have accepted or retained that benefit. Defendants profited from

these transactions and used the premiums collected from Plaintiff and Class members for business purposes.

126.    Under the principles of equity and good conscience, Defendants should not be permitted to retain the money belonging to Plaintiff and Class members, because Defendants wrongfully issued a blanket denial of Plaintiff and Class members' claims for business interruption coverage.

127.    If Plaintiff and Class members knew that Defendants would not provide coverage for business interruption claims, they would not have purchased the Policies.

128.    Plaintiff and Class members have no adequate remedy at law.

129.    As a direct and proximate result of Defendants' conduct, Plaintiff and Class members have suffered and will suffer injury, as described above, including, but not limited to, significant loss of business income and extra expenses in amounts to be proven at trial.

130.    Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class members, proceeds that they unjustly received from them.  In the alternative, Defendants should be compelled to refund the amounts that Plaintiff and Class members paid for the Policies.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the members of the Multi-State Class and New Jersey Sub-Class, prays for judgment in their favor and against Defendants, as follows:

a.    Declaring this action to be a proper class action maintainable pursuant to Rule 23(a) and Rule 23(b)(3) and declaring Plaintiff and its counsel to be representatives of the Class;

b.    Issuing a Declaratory Judgment declaring the Parties' rights and obligations under

the insurance policies;

c.  Awarding Plaintiff and Class members compensatory damages due to Defendants' breach of the insurance policies in an amount to be determined at trial, together with appropriate prejudgment interest at the maximum rate allowable by law;

d.  Awarding Plaintiff and Class members treble damages, equitable relief, attorneys' fees, and costs, as provided in Section 56:8-19 of the NJCFA;

e.  Awarding Plaintiff and Class members costs and disbursements and reasonable allowances for the fees of Plaintiff's and Class members' counsel and experts, and reimbursement of expenses; and

f.  Awarding such other and further relief the Court deems just, proper, and equitable.

## JURY TRIAL DEMAND

Pursuant to Rule 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Dated:  October 5, 2020

WILENTZ, GOLDMAN & SPITZER, P.A.
KEVIN P. RODDY
JOSHUA S. KINCANNON

By:    */s/ Kevin P. Roddy*
    KEVIN P. RODDY (NJSBA # 014802005)
    90 Woodbridge Center Drive, Suite 900
    Woodbridge, NJ  07095
    Telephone:  (732) 636-8000
    Facsimile:  (732) 726-6686
    E-mail:  kroddy@wilentz.com
            jkincannon@wilentz.com

LUKE MONTGOMERY*
BRAD PONDER*
MONTGOMERY PONDER, LLC
1015 15th Street NW, Suite 600
Washington, DC 20005
Phone:  (888) 201-0305
Facsimile:  (205) 208-9443
Email:        brad@montgomeryponder.com

BRIAN L. KINSLEY*
CRUMLEY ROBERTS
2400 Freeman Mill Road, Suite 200
Greensboro, NC  27406
Telephone:  (336) 333-9889
Facsimile:  (336) 333-9894
E-mail:  blkinsley@crumleyroberts.com

Attorneys for Plaintiff and the Proposed Class
(*-attorney admission to be sought *pro hac vice*)